NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0144n.06

No. 13-5252

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 19, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| DARIUS LEE ANDERSON, | ) | OPINION |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

**Before: COLE, GILMAN, and DONALD, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** A four-count indictment charged Darius Lee Anderson with two counts of robbery, in violation of 18 U.S.C. § 1951, and with two counts of using, carrying, and brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). After the district court denied Anderson's motion to suppress the evidence obtained from two searches of his grandmother's house, Anderson was tried before a jury. The jury convicted Anderson on all four counts.

Anderson was subsequently sentenced by the district court to a total of 430 months in prison. He now challenges the denial of his motion to suppress, the language of the indictment, the jury instructions, the verdict form, and the length of his sentence. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

An armed robbery occurred at an Oak Ridge, Tennessee Shell gasoline and convenience store on the morning of March 14, 2010.  A man entered the store, pointed an AK-47 rifle at the clerk and customers, and demanded money from the cash register.  In response, the clerk gave the robber approximately $400.  The robber concealed his face with a bandana.

A second armed robbery occurred at a Hampton Inn, also in Oak Ridge, shortly before dawn on the following day, March 15, 2010.  The robber, whose face was covered by a nylon stocking mask, pointed an AK-47 at the hotel clerk and demanded money from the drawer.  Complying with this demand, the clerk gave the robber approximately $120.  Both armed robberies were captured on video.

Officer Dustin Henderson of the Oak Ridge Police Department was dispatched to the Hampton Inn shortly after the robbery.  Henderson interviewed the hotel clerk, who told Henderson that the robber was a black man with a slim build.  The clerk also told Henderson that the robber drove a white, mid-1980s-style Oldsmobile with four doors.  Henderson watched the surveillance video of the robbery before leaving the hotel.

After Henderson left the Hampton Inn, he and other Oak Ridge police officers began searching for a car matching the hotel clerk's description.  A sheriff's deputy told Henderson that he had seen Anderson in a car of that type, and that Anderson had recently acquired an AK-47.  Henderson, who knew Anderson based on previous encounters with him, drove to 108 Houston Avenue in Oak Ridge, which was where Anderson's grandmother lived.

When he arrived at 108 Houston, Henderson saw a four-door car in the driveway that generally matched the description given by the hotel clerk.  Henderson and another Oak Ridge

police officer, John Thomas, walked toward the car. They noticed that the windows had very little condensation on them, the engine was ticking, and the hood was warm to the touch. Based on these observations, Henderson and Thomas concluded that the car had been driven shortly before they arrived at the house.

Henderson, Thomas, and Lieutenant Brad Jenkins then began to watch the house and the car. At approximately 7:40 a.m. on the same morning as the Hampton Inn robbery, Anderson left the house through the front door. The officers drew their weapons and ordered Anderson to approach them. Anderson obeyed their command. Henderson handcuffed Anderson and placed him under arrest.

Another Oak Ridge police officer who was present at 108 Houston, Jeremy Huddleston, subsequently conducted a warrantless search of the guest bedroom where Anderson stayed. During the search, Huddleston and a fellow officer, Ray Steakley, found an AK-47, a black sweatshirt, diamond earrings, a red cellular telephone, and a red shoestring.

Huddleston testified at the suppression hearing that Anderson's grandmother, Vernestine Anderson, had consented to the search. Ms. Anderson, in contrast, testified that although she had allowed Huddleston to enter her home, she never consented to a search of the guest bedroom. We need not decide whether Ms. Anderson in fact consented to the search, however, because the district court did not resolve the suppression motion on this ground.

Detective Jock Coleman interviewed Anderson at the police station later that same day. According to Coleman, Anderson admitted that he had visited the Hampton Inn in the morning but denied any involvement in the robbery. Coleman then prepared an application and affidavit in support of a search warrant for 108 Houston. The application explained the basis for the warrant in part as follows:

> Officers Jeremy Huddleston and Ray Steakley received consent from the home owner, Vernestine Anderson, to search the interior of her residence for evidence of the armed robbery of the Hampton Hotel. During this consent search of the residence the officers located a black assault rifle in the recess area of a headboard inside a bedroom of the residence, a red LG cell phone, a pair of diamond earrings, a red shoe string tied together to make a complete circle, a door key was attached to [t]he shoe string when found, and a black hooded pullover. Vernestine Anderson stated she had never seen the assault rifle before and it does not belong to her. All the other property belongs to her grandson Darius Lee Anderson, according to Vernestine Anderson.

(App'x to Appellant's Br. at A-2). In the section of the application describing the evidence that the police expected to find upon executing the warrant, Coleman wrote:

> One men's red hooded pullover, one men's black or dark blue hooded pullover with large unknown print on back, an Atlanta Braves [b]aseball cap dark in color with the letter "A" on the front, a dark in color "stocking mask", and U. S. Currency taken during the armed robbery, which occurred at the Oak Ridge Hampton Inn Hotel located at 208 South Illinois Avenue, Oak Ridge Tennessee on the 15th of March 2010.

(*Id.*)

The warrant itself, however, did not contain a similar listing. Instead, under a heading declaring that "Said evidence is now located on and within the residence of 108 Houston Avenue, Oak Ridge, Tennessee:", the warrant included the following narrative account of the Hampton Inn robbery, which had been copied-and-pasted from the warrant application:

> On or about March 15, 2010 the night clerk of the Oak Ridge Hampton Inn Hotel reported an armed robbery that occurred at approximately 4:52 AM. A lone gunman armed with a black assault rifle and wearing a dark colored "stocking mask" over his face confronted the night clerk at gunpoint and demanded the cash from the cash drawer. The gunman fled the business after stealing the cash from the night clerk. The night clerk recognized the gunman as the same subject who had entered the hotel approximately ten to fifteen minutes earlier inquiring about renting a room. When the subject entered the hotel inquiring about room rentals he was wearing a dark colored Atlanta Braves [b]aseball cap with the letter "A" on the front, a red hooded pullover, dark shirt, a red lanyard around his neck, and dark colored shoes. The night clerk observed the white four-door vehicle driven by the subject when he entered the hotel and inquired about the room rental. The night clerk observed the same white four-door vehicle drive into the parking lot just before the gunman entered the hotel and robbed the clerk.

(*Id.* at A-4) Rather than an isolated listing of items to be seized, in other words, the identifying evidence is embedded in the narrative account.

A state-court judge authorized the warrant on March 17, 2010. Oak Ridge police officers, including Coleman, executed the warrant that same day. Officers seized two hooded jackets and two Atlanta Braves baseball caps during their search.

Following his indictment by a federal grand jury on robbery and firearms-related charges, Anderson filed a motion to suppress the evidence found during the two searches of his grandmother's house. The district court referred the motion to a magistrate judge. An evidentiary hearing on the motion occurred in February 2011. Four officers from the Oak Ridge Police Department—Coleman, Henderson, Huddleston, and Jenkins—testified on behalf of the government. Anderson called his grandmother as his only witness.

Crediting the testimony of Ms. Anderson that she did not consent to the warrantless search of her guest bedroom on March 15, the magistrate judge recommended in a lengthy Report and Recommendation that Anderson's motion to suppress be granted. The magistrate judge further concluded that the March 17 search was invalid because the search warrant was facially deficient. Relying extensively on *Groh v. Ramirez*, 540 U.S. 551 (2004), the magistrate judge explained that the warrant failed to satisfy the Fourth Amendment's particularity requirement. *See United States v. Anderson*, No. 3:10-CR-43, 2011 WL 4824402, at *26 (E.D. Tenn. June 23, 2011) ("The Court finds that this paragraph is clearly not a list of items to be seized and, as such, fails to satisfy the particularity requirement."). Finally, the magistrate judge rejected the government's arguments that (1) the evidence seized during the warrantless search on March 15 was subject to the inevitable-discovery rule, and (2) suppression was an inappropriate remedy because the officers acted in good faith.

The government filed objections to the Report and Recommendation. Anderson did not respond to the government's objections. The district court sustained most of the government's objections and ultimately denied Anderson's motion to suppress. Rejecting in part the magistrate judge's conclusions, the district court held that the evidence from the warrantless search on March 15 was admissible because the officers would have inevitably discovered it during the March 17 search pursuant to the warrant. The district court, moreover, held that the search warrant satisfied the "particularity requirements of the Fourth Amendment because the officers were limited to seizing the items specifically contained in the seizure paragraph." *United States v. Anderson*, No. 3:10-CR-43, 2011 WL 4828886, at *3 (E.D. Tenn. Oct. 11, 2011).

Anderson was tried before a jury in September 2012. At trial, the government called several witnesses who were present during the robberies. These witnesses included the Shell convenience store clerk (Andrew Carlton), a witness to the convenience store robbery (Deborah Harpe), and the Hampton Inn clerk (Nathan Morrow).

The government also called Michael Spence, an investigator for the Knoxville Police Department. Spence testified that he was asked to "clarify" the surveillance video from the Hampton Inn, which involved the use of specialized software to alter the lighting and playback speed of the videotape. (Trial Tr., Page ID # 718) This was necessary because the original videotape from the hotel was degraded from repeated use. (*Id.* at 720)

Much of the government's case depended on the items found during the two searches at 108 Houston. For example, the Assistant United States Attorney (AUSA) explained in her closing argument that "Morrow testified that when the person came in [to the hotel] . . . they were wearing a red sweatshirt . . . [that] was found in this defendant's—the back front bedroom where he kept his clothing." (*Id.* at 869–70) The AUSA also repeatedly referred to the AK-47

found in the guest bedroom.  (*See id.* at 858-60, 870)  And despite the poor quality of the surveillance video, the government pointed to the connections between what the video depicted and the evidence obtained from the two searches:

> The robbery of the Hampton Inn, it's true, it's grainy up in this part, and attempts to clarify the video were made and it's now as clear as it can be.  But when you look at Government's 8B and Government's 8C, you see an eagle design on the back of that sweatshirt.  This is the robber of the Hampton Inn.
>
> And, lo and behold, a big old coincidence, this sweatshirt was found in the front bedroom where this defendant kept his clothing, eagle on the back of that sweatshirt.  Another big, old coincidence, ladies and gentlemen.

(*Id.* at 870)  Particularly damning was the text message sent from the red cellular telephone recovered during the warrantless search on March 15.  The message read:  "I just robbed the Shell station."  (*Id.* at 792)

After less than three hours of deliberation, the jury convicted Anderson on all four counts.  The district court subsequently imposed a total sentence of 430 months in prison and three years of supervised release.  This timely appeal followed.

Anderson argues that the district court erred in denying his motion to suppress.  He further contends that the indictment was impermissibly duplicitous and, as a result, the jury instructions and verdict form were defective.  Anderson's final argument is that he is entitled to be resentenced in light of the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013).  The government, in response, urges us to affirm the convictions and sentence in all respects.

## II.  ANALYSIS

### A.  Standard of review

We review the district court's denial of a motion to suppress under a hybrid standard. *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010).  Under the hybrid standard, findings

of fact are upheld unless they are clearly erroneous and conclusions of law are reviewed de novo. *Id.* Because Anderson's motion to suppress was denied, we review the evidence in the light most favorable to the government. *See United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006).

Whether an indictment is duplicitous is a question of law that we review de novo. *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007). Nonetheless, if a defendant fails to object to the indictment in the district court, then we review the claim pursuant to the plain-error standard. *United States v. Lloyd*, 462 F.3d 510, 514 (6th Cir. 2006). Under the plain-error standard, "[w]e may consider relief for an error not raised below only if we find (1) error, (2) that is 'plain,' and (3) that affects the substantial rights of the defendant." *United States v. Mack*, 729 F.3d 594, 607 (6th Cir. 2013) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

**B. The district court did not err in denying Anderson's motion to suppress**

The starting point for our analysis of whether the search warrant in this case passes constitutional muster is the Supreme Court's decision in *Groh v. Ramirez*, 540 U.S. 551 (2004). In *Groh*, federal agents applied for a warrant to search a ranch in Montana for weapons and explosives. *Id.* at 553. The application explained that the search was for "any automatic firearms or parts to automatic weapons, destructive devices to include but not limited to grenades, grenade launchers, rocket launchers, and any and all receipts pertaining to the purchase or manufacture of automatic weapons or explosive devices or launchers." *Id.* at 554 (internal quotation marks omitted). An affidavit accompanied the application, and a magistrate judge signed the warrant form. *Id.*

The warrant in *Groh*, however, "failed to identify any of the items that [the agents] intended to seize." *Id.* Instead, in the section of the warrant "that called for a description of the 'person or property' to be seized, [the agents] typed a description of respondents' two-story blue

house rather than the alleged stockpile of firearms." *Id.* The warrant did not incorporate by reference either the application (which, unlike the warrant, did contain a description of the property to be seized) or the affidavit.

Writing for a majority of the Supreme Court, Justice Stevens explained that the warrant was facially invalid because it "failed altogether" to describe with particularity the property to be seized. *Id.* at 557. Moreover, because the warrant did not incorporate the application by reference, the description of property in the application did not "save the *warrant* from its facial invalidity." *Id.* (emphasis in original). Nor did the fact that the search of the ranch was "reasonable" cure the facial defect in the warrant. *Id.* at 558 (internal quotation marks omitted). The Court thus held that the search was unconstitutional under the Fourth Amendment. *Id.* at 563.

Anderson urges us to apply *Groh* and invalidate the search warrant in this case. The government, on the other hand, argues that *Groh* is distinguishable. Although the government offers a number of arguments on this point, its arguments can be boiled down to the single proposition that the warrant is sufficiently particular because the officers could readily ascertain which items were subject to seizure based on the identifying evidence embedded in the narrative report of the Hampton Inn robbery. Central to the government's argument is this court's prior pronouncement that the degree of specificity in a warrant "is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999) (internal quotation marks omitted). According to the government, the list of items to be seized can "easily [be] extracted from the seizure paragraph" (Resp. Br. at 13), particularly because the paragraph is preceded by the statement in the warrant that "Said evidence is now located on and within the residence at 108 Houston Avenue."

The government's argument that the officers could easily sift through the narrative paragraph in the warrant to identify the items to be seized has considerable merit. In this regard the alleged defect in the warrant is readily distinguishable from the fatal error in *Groh*. In *Groh*, the warrant did not describe the evidence to be seized "*at all*." *Groh*, 540 U.S. at 558 (emphasis in original). The warrant in *Groh* instead contained a nonsequitur: "[T]he items [to be seized] consisted of a 'single dwelling residence . . . blue in color.'" *Id.*

Here, although the warrant was inartfully drafted and apparently never proofread, it is not limited to a nonsequitur comparable to the warrant in *Groh*. Although Detective Coleman inserted a paragraph-length account of the Hampton Inn robbery in the space where a list of evidence should have appeared, the items to be seized can easily be gleaned from a "commonsense and realistic" reading of the warrant. *See United States v. Dunn*, 269 F. App'x 567, 571 (6th Cir. 2008) (internal quotation marks omitted). These items include a "black assault rifle," a "dark colored 'stocking mask,'" a "dark colored Atlanta Braves [b]aseball cap," a "red hooded pullover," a "dark shirt," a "red lanyard," and "dark colored shoes." (App'x to Appellant's Br. at A-4) Accordingly, the warrant—although far from a model of careful drafting—satisfies the particularity requirement of the Fourth Amendment.

The government also invokes the inevitable-discovery doctrine to argue that the evidence recovered during the initial warrantless search on March 15 is admissible. This doctrine permits items obtained by unlawful means to be admitted if the government can prove by a preponderance of the evidence that the items inevitably would have been discovered through lawful means. *See United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) (explaining the contours of the doctrine). The district court concluded that the inevitable-discovery doctrine applied. *See United States v. Anderson*, No. 3:10-CR-43, 2011 WL 4828886, at *2

(E.D. Tenn. Oct. 11, 2011) (holding that "the evidence seized during the warrantless search on March 15 would have been found pursuant to the search warrant's execution"). Even the magistrate judge most likely would have applied the doctrine if he had concluded that the warrant was valid. *See United States v. Anderson*, No. 3:10-CR-43, 2011 WL 4824402, at \*31 (E.D. Tenn. June 23, 2011) ("In the present case, if the March 17 search warrant had been valid, it could have provided a basis for the application of the inevitable discovery doctrine.").

Anderson, for his part, does not offer any developed argument as to why the inevitable-discovery doctrine should not apply, except to note that the doctrine "does not forgive the illegal original search." (Appellant's Br. at 13) We agree with the district court that the items found during the March 15 warrantless search of the guest bedroom inevitably would have been discovered during the March 17 search. Accordingly, because we conclude that the warrant is valid and the inevitable-discovery doctrine applies, the district court did not err in denying Anderson's motion to suppress.

## C. Anderson's remaining arguments are without merit

Anderson next argues that the indictment was impermissibly duplicitous. In particular, he contends that the two firearms-related counts (Counts Two and Four) in the indictment, which charged that Anderson "did knowingly use, carry and brandish a firearm . . . during and in relation to a crime of violence," actually constituted separate offenses because using and carrying a firearm is a separate offense from brandishing a firearm. *See United States v. Alleyne*, 133 S. Ct. 2151, 2162 (2013) (explaining that brandishing "constitutes an element of a separate, aggravated offense that must be found by the jury"). Because they are separate offenses, the argument goes, the indictment was duplicitous and Anderson's convictions on Counts Two and Four must be vacated.

Anderson also objects to the jury instructions and the verdict form for similar reasons. He points out that the jury did not receive a separate instruction on brandishing. And he notes that the verdict form botched the language—the form described the firearms-related counts as "using, brandishing *or* carrying a firearm during and in relation to [a] crime of violence." (Verdict Form, Page ID ## 596–97) (emphasis added). Anderson argues that these alleged errors in the jury instructions and the verdict form prejudiced him by increasing the risk of a non-unanimous verdict. Finally, Anderson contends that even if his convictions are not reversed, he is entitled to be resentenced on the firearms-related counts in light of the Supreme Court's holding in *Alleyne*.

We need not decide whether the indictment was duplicitous, however, because Anderson cannot demonstrate that he suffered any prejudice as a result of the alleged error. *See United States v. Kakos*, 483 F.3d 441, 446 (6th Cir. 2007) (holding that the court "need not consider whether the indictment was duplicitous" because the defendant could not show prejudice). Given the overwhelming evidence offered against Anderson at trial, including uncontroverted testimony from eyewitnesses that Anderson brandished an assault rifle during both of the robberies (*see* Trial Tr., Page ID ## 672, 696–98, 734), Anderson's argument regarding the risk of a non-unanimous verdict fails.

Likewise, we find no merit in Anderson's contention that resentencing on Counts Two and Four is required. The government acknowledges that the jury failed to make a specific finding regarding whether Anderson brandished a firearm. (*See* Resp. Br. at 24) (conceding that "the jury did not specifically find that the defendant 'brandished' the firearm, and . . . a jury finding as to a statutory sentencing enhancement is now required post-*Alleyne*"). Notwithstanding this concession, the government argues that the lack of a specific jury finding as

to brandishing is harmless in this case. We agree. Applying the plain-error standard, which is "akin to . . . harmless error analysis," our inquiry is whether "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Mack*, 729 F.3d 594, 607–08 (6th Cir. 2013) (internal quotation marks omitted).

After examining the entire record, we are convinced that if the jury had been properly instructed, it would have found beyond a reasonable doubt that Anderson brandished a firearm during both of the robberies. *See id.* at 609 (holding in a post-*Alleyne* case that the lack of a specific jury finding as to brandishing was harmless where the evidence of brandishing offered at trial was overwhelming). Anderson's convictions on Counts Two and Four thus survive his *Alleyne* challenge, and resentencing is not required.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.